79 F.3d 955
 96 Cal. Daily Op. Serv. 2252, 96 Daily Journal
D.A.R. 3751
Saideh FISHER, aka Saideh Hassib-Tehrani; Kian Hosseini
Lavasani, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 91-70676.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 13, 1993.
Filed Oct. 5, 1994.
Amended July 31, 1995.
Order Granting Rehearing En Banc Filed Sept. 29, 1995.
Argued and Submitted Nov. 30, 1995.
Decided April 2, 1996.
 
 Walter Rafael Pineda, Charles E. Nichol, San Francisco, California; Carolyn Patty Blum, Central American Refugee Defense Fund, Berkeley, California, for petitioners.
 Karen Fletcher Torstenson, Thomas W. Hussey, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.
 Petition for Review of a Decision of the Board of Immigration Appeals; INS Nos. Aty-enj-bog, Axj-rvh-hsz.
 Before: WALLACE, FLETCHER, CANBY, HALL, BRUNETTI, JOHN T. NOONAN, Jr., THOMPSON, O'SCANNLAIN, TROTT, FERNANDEZ, and RYMER, Circuit Judges.
 Opinion by Judge WALLACE; Concurrence by Judge CANBY; Dissent by Judge NOONAN.
 WALLACE, Circuit Judge:
 
 
 1
 Saideh Fisher and her son Kian Hosseini Lavasani are natives and citizens of Iran. On her behalf, as well as for her son, Fisher petitions for review of the Board of Immigration Appeals' (Board) decision denying her application for asylum and withholding of deportation. The Board also denied Fisher's application for voluntary departure pursuant to section 244(e) of the Immigration and Nationality Act (Act). 8 U.S.C. § 1254(e). We have jurisdiction over this timely appeal pursuant to 8 U.S.C. § 1105a(a). The petition is denied.
 
 
 2
 * Fisher and her son entered the United States on April 30, 1984. Because her son's immigration status derives from her own, our discussion will focus on the status of Fisher. 8 C.F.R. § 208.21 (1995). Although Fisher was admitted as the fiancee of a United States citizen, she did not marry her then-fiancee within the 90-day period allowed by her visa. Instead, on August 4, 1984, she married Charles Fisher (Charles), a United States citizen. They were divorced in 1987.
 
 
 3
 Prior to their divorce, Charles filed a petition in support of Fisher's application for permanent resident status. On February 3, 1986, he withdrew the petition and filed an affidavit which stated, "I was given $500.00 to marry my wife Saideh." According to the affidavit, a co-worker apparently told Charles that Fisher's step-cousin, to whom she was originally engaged to be married, would pay him the $500. Charles also denied living with Fisher on a continuous basis since their marriage.
 
 
 4
 Accordingly, on February 3, 1986, the Immigration and Naturalization Service (INS) denied Fisher's application for permanent resident status and began deportation proceedings. Fisher conceded deportability and filed for asylum and withholding of deportation pursuant to 8 U.S.C. §§ 1158(a), 1253(h).
 
 
 5
 An immigration judge (IJ) held two hearings, one on May 15, 1987, concerning Fisher's application for voluntary departure, and another on September 25, 1987, concerning Fisher's asylum application. At the May hearing, Fisher testified that she originally came to the United States to marry Robert Lavasani, her step-cousin. When she arrived, she learned that he was living with and had impregnated another woman. Upset and lonely, she testified that she then married Charles, but she denied offering him money to marry her. She suspected that Charles withdrew his petition in support of her application for permanent resident status because he "never kept his promises" and he took advantage of her.
 
 
 6
 Fisher testified that she lived with Charles as husband and wife for approximately one year. Yet in preparation for an interview conducted by INS officials to determine the validity of her marriage, Fisher testified that she reviewed potential questions and answers with Charles. She also referred to handwritten notes during the interview, which contained information including: what time she and her husband went to sleep at night, how often she saw his two daughters, what kind of food he likes, what time he comes home from work, how much money he gives her, how long they have lived in their new house, what kind of car they own, what kind of television programs he watches, his parents' names, what clothing items he owns, and what brand of cigarettes he smokes. The notes also contained information such as her parents' names, her own birth date, and her place of work. Fisher testified that she needed these notes because she had difficulties remembering many things, in part because of her traumatic experiences in Iran.
 
 
 7
 Charles was not available to testify at the May hearing. The INS issued a subpoena, to which he did not respond; its investigations unit attempted to locate him, but without success. An INS officer who interviewed Fisher in depth also was unavailable to testify because he had been reassigned to Alaska. Another INS officer, who interviewed Fisher briefly, testified that she told him she had a bona fide marriage with Charles. The IJ decided that "the case will just have to stand on the evidence" presented as well as Fisher's own testimony. Fisher's counsel did not object.
 
 
 8
 At the September hearing on Fisher's asylum application, she testified that she left Iran in February 1984 following three events. First, Fisher testified that she was detained and questioned by Khomeini government officials because she attended a party at a male friend's home where she observed her host in a bathing suit. When this occurred is unclear, but she alleges to us that it was approximately six months prior to leaving Iran. Along with several other female guests, Fisher was held at the "Comite"--probably a police station--for several hours. The authorities recorded Fisher's name and address, and they told her that being present with a man in a bathing suit was "incorrect." She was then released.
 
 
 9
 The next incident occurred approximately one month prior to her departure from Iran. Fisher testified that four government officials stopped her on the street and ordered her into their car at gunpoint. She said she was stopped because she "had a few pieces of hair hanging out [of her chador or veil] by mistake." The officials told her that she was not dressed properly, returned her to her home, and admonished her not to appear on the street like that again.
 
 
 10
 The third incident occurred shortly after the "veil incident." Fisher testified that government officials came to her father's home, where Fisher lived, to search for political dissidents. She said that the search was a "normal" occurrence, and that she assumed the officials were looking for persons associated with her brother-in-law, who was in prison at the time. In her brief to this court, Fisher suggests that her brother-in-law was arrested for political activities, but there was no record testimony concerning the reasons for his imprisonment. Government officials did not question or detain Fisher as a result of the search. They merely asked her to inform them if she learned of any persons who were "against the regime," and they left.
 
 
 11
 Fisher testified that these three events so traumatized her that she became ill, missed several months of work, and eventually left Iran. She argues that these events amount to persecution on account of her religious and political beliefs. With respect to these beliefs, Fisher testified that she did not believe in "the way [the Khomeini government] treat[s] people, the covering of the face, and the way of life" dictated by the government. When asked what might happen to her if she returned to Iran, Fisher responded that she "presumes" she would be "in a worse situation" than before she left. Significantly, Fisher did not state whether she would comply with the governmental requirements if she returned to Iran.
 
 
 12
 The IJ found Fisher's testimony concerning her application for asylum credible, but nevertheless denied her request for asylum and withholding of deportation because she did not have a well-founded fear of persecution and did not face a clear probability of persecution. The IJ also denied Fisher's request for voluntary departure, finding that she married Charles solely for immigration purposes. The IJ based his decision on Charles's affidavit and Fisher's behavior during her interview with the INS interviewing officer. He found Fisher's testimony concerning her marriage not credible.
 
 
 13
 Fisher appealed from the IJ's decisions to the Board, which independently reviewed the record and affirmed the IJ's findings concerning Fisher's application for asylum and withholding of deportation. The Board first held that general enforcement of Iran's rules concerning the interaction between men and women and clothing restrictions, which require all women to wear "ultraconservative dress," do not "rise to the level of persecution." It also held that although Fisher stated she feared persecution upon return to Iran, she failed to present sufficient evidence showing how the government's actions related specifically to her and to her beliefs. For example, the Board found that Fisher provided no evidence of how the search of the family home related to her. The Board also adopted the IJ's findings and decision concerning Fisher's request for voluntary departure.
 
 
 14
 A three-judge panel of this court vacated the Board's decision and remanded, holding that (1) the Board failed to consider whether Fisher would suffer future persecution if she returned to Iran; (2) the Board improperly defined "persecution"; (3) Fisher may suffer persecution on account of her religious beliefs as a result of Iran's enforcement of its conduct and dress rules; and (4) Fisher may face persecution on account of her political beliefs based on a "totality of the circumstances." Fisher v. INS, 61 F.3d 1366 (9th Cir.1995). Because the three-judge panel remanded for the Board to reconsider Fisher's application for asylum, it did not reach the issue of voluntary departure. We decided to rehear this case en banc and withdraw our panel opinion.
 
 II
 
 15
 Section 208(a) of the Act, 8 U.S.C. § 1158(a), gives the Attorney General discretion to allow political asylum to any alien the Attorney General determines to be a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A). A refugee is defined as an alien unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish eligibility on the basis of a "well-founded fear of persecution," Fisher's fear of persecution must be both subjectively genuine and objectively reasonable. Ghaly v. INS, 58 F.3d 1425, 1428 (9th Cir.1995) (Ghaly ). "The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution." Prasad v. INS, 47 F.3d 336, 338 (9th Cir.1995) (Prasad ). The objective component requires a showing by credible, direct, and specific evidence in the record, of facts supporting a reasonable fear of persecution on the relevant ground. Id. Fisher has the burden of making this showing. Ghaly, 58 F.3d at 1428; 8 C.F.R. § 208.13(a) (1995).
 
 
 16
 Section 243(h) of the Act, 8 U.S.C. § 1253(h), requires the Attorney General, subject to certain exceptions not relevant here, to withhold deportation "if the Attorney General determines that such alien's life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." An alien is statutorily eligible for such relief if he or she demonstrates a "clear probability of persecution." Ghaly, 58 F.3d at 1429 (internal quotation omitted). This standard is more stringent than the "well-founded fear" standard applicable to requests for asylum, and it can be met only by showing that it is more likely than not that the alien will be persecuted if deported. Id. "Therefore, failure to satisfy the lesser standard of proof required to establish eligibility for asylum necessarily results in a failure to demonstrate eligibility for withholding of deportation as well." Id. Thus, we first focus on whether Fisher proved she was eligible for asylum.
 
 
 17
 We review the Board's determination that Fisher failed to demonstrate a "well-founded fear of persecution," including its factual findings, for substantial evidence. INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (Elias-Zacarias ); 8 U.S.C. § 1105a(a)(4). The burden on Fisher is a heavy one. To obtain reversal, Fisher must establish that the evidence not only supports the conclusion that she suffered persecution or has a well-founded fear of persecution, but compels it. Ghaly, 58 F.3d at 1431. Fisher must demonstrate that "the evidence [she] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 483-84, 112 S.Ct. at 817. "Phrased differently, [Fisher] must demonstrate that any reasonable factfinder would have to conclude that [she] has a well-founded fear of persecution." Ghaly, 58 F.3d at 1431 (internal quotation omitted). We review the Board's legal interpretations of the Act de novo, but such interpretations generally are entitled to deference under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Chevron ). Ghaly, 58 F.3d at 1429.
 
 III
 
 18
 We begin by reviewing the Board's application of section 101(a)(42)(A) of the Act, which defines "refugee" as a person who has suffered persecution or has a well-founded fear of persecution. 8 U.S.C. § 1101(a)(42)(A). The Act does not define "persecution"; therefore, we must defer to the Board's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." Romero v. INS, 39 F.3d 977, 980 (9th Cir.1994), quoting Chevron, 467 U.S. at 844, 104 S.Ct. at 2782; see also Barrera-Echavarria v. Rison, 44 F.3d 1441, 1444 (9th Cir.) (en banc) (court may not substitute its own construction of the Act for the Board's reasonable interpretation), cert. denied, --- U.S. ----, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995).
 
 
 19
 In interpreting the Act, the Board is bound by our earlier decisions, which define "persecution" generally as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." See, e.g., Ghaly, 58 F.3d at 1431, quoting Prasad, 47 F.3d at 339. Persecution is an extreme concept, which ordinarily does not include "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be." Ghaly, 58 F.3d at 1431.
 
 
 20
 The Board's analysis of "persecution" here is consistent with the Act and our prior decisions. The Board found that Fisher did not suffer persecution or have a well-founded fear of persecution based on the Iranian government's enforcement of its regulations against her. The Board stated that although enforcement of Iran's dress and conduct rules may seem harsh by Western standards, it does not "rise to the level of persecution." This conclusion is consistent with our cases that distinguish prosecution for general crimes from persecution, as well as those that construe persecution to include mental suffering. See Abedini v. INS, 971 F.2d 188 (9th Cir.1992) (Abedini ); Kovac v. INS, 407 F.2d 102 (9th Cir.1969) (Kovac ).
 
 
 21
 Fisher's assertion that the government will prosecute her for violating the dress and conduct rules does not alone amount to persecution on account of religious or political beliefs. She "merely has established that [she] faces a possibility of prosecution for an act deemed criminal in Iranian society, which is made applicable to all [women] in that country." Abedini, 971 F.2d at 191. The two exceptions to the general rule that prosecution does not amount to persecution--disproportionately severe punishment and pretextual prosecution--do not apply here. See id. First, Fisher failed to show that Iran selectively enforced its regulations against her or that she received disproportionately severe punishment on account of one of the five grounds enumerated in the Act. See id. Second, she failed to establish that the regulations as applied to her were "especially unconscionable or were merely a pretext to persecute [her] for [her] beliefs or characteristics." Id., citing Alonzo v. INS, 915 F.2d 546, 548 (9th Cir.1990) (holding that applicant must demonstrate government knew of his religious or political beliefs and attempted to conscript him in spite of those beliefs). Fisher testified that as a result of the "swimsuit incident," she and several other females present were detained by government officials. She also testified that the "veil incident" came about only because she had mistakenly left several strands of hair outside her chador. Neither of these occurrences indicates that government officials knew of her political or religious beliefs or punished her on account of them. Nor do they indicate that she was punished as a pretext to persecute her for her beliefs.
 
 
 22
 The Board's interpretation of persecution also is consistent with our decisions defining persecution to encompass both physical and mental suffering. See Kovac, 407 F.2d at 106-07 (Congress's deletion of "physical persecution" from the Act indicates persecution may include mental suffering). Based on the record Fisher established, the Board held that she failed to show any past or potential persecution, mental or physical. It found that Fisher failed to provide evidence showing that the enforcement of the dress and conduct regulations against her constituted persecution or created a well-founded fear of future persecution. See Safaie v. INS, 25 F.3d 636, 640-41 (8th Cir.1994) (general assertion that Iran's policies are repressive or that applicant disagrees with them does not "demonstrate that [the applicant] fears particularized persecution directed at her personally on the basis of her political opinion").
 
 
 23
 Fisher contends that although enforcement of laws such as those enforced against her could be viewed merely as harassment not reaching the level of persecution, Iran's human rights record somehow transforms common harassment into persecution. This argument is unacceptable. The mere existence of a law permitting the detention, arrest, or even imprisonment of a woman who does not wear the chador in Iran does not constitute persecution any more than it would if the same law existed in the United States. Persecution requires the government actor to inflict suffering on account of an individual's religious or political beliefs, race, nationality, or membership in a particular social group. See Ghaly, 58 F.3d at 1431 (defining persecution as infliction of suffering upon those who differ because of their religious or political beliefs); cf. 8 U.S.C. § 1101(a)(42)(A) (defining refugee as person who suffers persecution "on account of" one of the five enumerated grounds). It does not include mere discrimination, as offensive as it may be. Ghaly, 58 F.3d at 1431.
 
 
 24
 Fisher has the burden of showing the requisite connection between the Iranian government's acts and her religious or political beliefs. She must show that "the Iranian government's potential act of persecution stemmed from its desire to single [her] out for unique punishment because of [her] actually-held or perceived-to-be-held political or religious beliefs." Abedini, 971 F.2d at 192 n. 1; see also Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 816 (" 'persecution on account of ... political opinion' in § 101(a)(42) is persecution on account of the victim's political opinion, not the persecutor's").
 
 
 25
 Fisher failed to show that Iran punished her because of her religious or political beliefs, or that, if she returned to Iran, she would violate the regulations because of her beliefs, thereby triggering government action. Abedini, 971 F.2d at 192 (applicant must show that the government was aware of his alleged beliefs). No evidence suggests that Fisher ever "spoke out against the government's political or religious practices or even publicly articulated any political or religious opinions." Id. Although she stated that she is against the Khomeini regime and disagrees with its theory of Islam, she introduced no evidence suggesting that the three incidents she described were related to these beliefs.
 
 
 26
 There also is no evidence suggesting that if she returned to Iran, Fisher would not conform with the regulations. Indeed, she testified that the "veil incident" occurred because she mistakenly left several strands of hair outside her veil, not because she intended to make a political or religious statement. She also testified that the search of her father's home was "a normal thing that [the government does]," which suggests no connection to her religious or political beliefs whatsoever.
 
 
 27
 Because Fisher has demonstrated only discrimination on account of her sex, not persecution on account of her religious or political beliefs, she has failed to carry her burden under Ghaly. Persecution on account of sex is not included as a category allowing relief under section 101(a)(42)(A) of the Act.
 
 
 28
 Fisher argues she did establish that enforcement of the regulations in Iran constitutes more than mere harassment. She bases her argument on information contained in the State Department's Country Reports on Human Rights Practices for 1990, which is not part of the administrative record. The Act limits our review to the "administrative record upon which the deportation order is based and the Attorney General's findings of fact." 8 U.S.C. § 1105a(a)(4). See also Gomez-Vigil v. INS, 990 F.2d 1111, 1113 (9th Cir.1993) (Gomez-Vigil ) (reviewing court is "not permitted to consider evidence that is not part of the administrative record"); Tejeda-Mata v. INS, 626 F.2d 721, 726 (9th Cir.1980) (reviewing court does not conduct factfinding in the first instance), cert. denied, 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982); Rybachek v. United States Environmental Protection Agency, 904 F.2d 1276, 1296 n. 25 (9th Cir.1990) ("Judicial review of agency actions should generally be confined to the original record upon which the actions were based."). To the extent our prior decisions may be interpreted as authorizing us to take judicial notice of information not part of the administrative record or not previously submitted to the Board, they are overruled as inconsistent with the Act and prior precedent. These decisions include Ubau-Marenco v. INS, 67 F.3d 750, 759 (9th Cir.1995) (taking judicial notice of State Department Country Reports where INS did not object); Nasseri v. Moschorak, 34 F.3d 723, 727 (9th Cir.1994) (taking judicial notice of "background evidence" offered by petitioner); Shirazi-Parsa v. INS, 14 F.3d 1424, 1428 (9th Cir.1994) (Shirazi-Parsa ) (suggesting that this court may take judicial notice even if Board did not abuse its discretion in declining to do so); Lazo-Majano v. INS, 813 F.2d 1432, 1435 (9th Cir.1987) (taking judicial notice of reports supporting petitioner's asylum claim).
 
 
 29
 Fisher could have requested the Board to take administrative notice of the Country Report, but she did not. If she had, and the Board refused, we would review the Board's action for an abuse of discretion. Shirazi-Parsa, 14 F.3d at 1428. Here, there is no such abuse because Fisher never offered the 1990 Country Report or the facts contained in it to the Board. See Liu v. Waters, 55 F.3d 421, 427 (9th Cir.1995) (Board is "not required independently to take administrative notice of [country] conditions" where petitioner "provided no such information"). Because we are limited to reviewing the facts considered by the Board, we are statutorily prevented from taking judicial notice of the Country Report. See id. (taking judicial notice only of materials applicant presented to the Board for administrative notice). If Fisher believes the 1990 Country Report or other documents are material to her asylum application, her only course is to file a motion to reopen her deportation proceedings pursuant to 8 C.F.R. §§ 3.2, 208.19 (1995).
 
 
 30
 Fisher also argued that the State Department's Country Reports on Human Rights Practices for 1986 should be considered part of the administrative record because the IJ relied on a portion of it in rendering his decision. In rejecting Fisher's argument that she was fired from her teaching position in Iran solely because she is a woman, the IJ stated that the 1986 Country Report provides no evidence that the government routinely fires women from teaching jobs. At oral argument before the en banc court, Fisher suggested that because the IJ relied on a portion of the 1986 Country Report, the entirety of the Report should be made part of the administrative record.
 
 
 31
 INS regulations provide that Department of State comments requested by the IJ in particular cases become part of the administrative record. 8 C.F.R. § 208.11(c) (1995). Here, the IJ did not request any such comments from the Department of State, and the IJ's reliance on the 1986 Country Report, which contains generally applicable information, cannot be construed as State Department comments within the meaning of the regulations.
 
 
 32
 We may review out-of-record evidence only where (1) the Board considers the evidence; or (2) the Board abuses its discretion by failing to consider such evidence upon the motion of an applicant. See Shirazi-Parsa, 14 F.3d at 1428. Allowing the Board to consider out-of-record evidence only on motion of the applicant is consistent with the Act's placement of the burden of proof on the applicant's shoulders and with an analogous federal evidentiary rule. Federal Rule of Evidence 106 expresses the "rule of completeness," which states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." See Charles A. Wright & Kenneth W. Graham, Jr., 21 Federal Practice and Procedure §§ 5071-79 (1977 & Supp.1995). Where an applicant requests the Board to take administrative notice of evidence on which the IJ relied, we will review a refusal to do so for an abuse of discretion. Shirazi-Parsa, 14 F.3d at 1428; see also Elnager v. INS, 930 F.2d 784, 787 (9th Cir.1991) (Board "has the power to conduct a de novo review of the record ... and independently to determine the legal sufficiency of the evidence").
 
 
 33
 Fisher could have requested either the IJ or the Board to supplement the administrative record with the 1986 Country Report; she did neither. Her appeal brief to the Board contested neither the IJ's finding that she was not dismissed from her teaching position solely because of her status as a woman, nor the IJ's reliance on parts of the 1986 Country Report which she now claims support her asylum application. There is no evidence that the Board took into account the 1986 Country Report, and its decision is "sufficient for us to conduct our review and to be assured that the petitioner's case received individualized attention." Ghaly, 58 F.3d at 1430; see also id. (Board is not required to indicate with specificity the weight it accorded certain exhibits). We will not create a new administrative record on appeal by reviewing evidence that the Board did not consider. See Gomez-Vigil, 990 F.2d at 1113.
 
 
 34
 This is not a case such as Gomez-Vigil, where the Board took administrative notice of certain facts without providing the petitioner an opportunity to rebut the noticed facts. Id. at 1114. In this case, Fisher did not request the IJ to include the entirety of the Country Report. In addition, she had ample opportunity to request consideration of the Country Report and to rebut the IJ's findings in her appeal to the Board, but she failed to do so. We will not remand this case to the Board for it to consider evidence Fisher failed to present. Roque-Carranza v. INS, 778 F.2d 1373, 1373-74 (9th Cir.1985); cf. Rivera-Cruz v. INS, 948 F.2d 962, 967 (5th Cir.1991) (asylum applicant cannot raise new evidence on appeal from Board's decision to contest officially noticed facts).
 
 
 35
 In sum, the Board's decision concluding that Fisher failed to show she suffered persecution or had a well-founded fear of persecution on account of her political or religious beliefs is supported by substantial evidence. Fisher failed to allege acts constituting persecution, and she failed to show that the Iranian government took action against her because of her political or religious beliefs. Indeed, the record indicates that Fisher received routine punishment for violating generally applicable laws. Thus, she failed to carry her burden by not presenting evidence "such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." Elias-Zacarias, 502 U.S. at 481, 112 S.Ct. at 815. Because Fisher failed to satisfy the lesser standard of proof required to establish eligibility for asylum, she necessarily failed to demonstrate eligibility for withholding of deportation. Ghaly, 58 F.3d at 1429.
 
 IV
 
 36
 The Board also adopted the findings and decision of the IJ denying Fisher voluntary departure pursuant to 8 U.S.C. § 1254(e). We therefore review the IJ's decision. Kazlauskas v. INS, 46 F.3d 902, 905 (9th Cir.1995). We examine whether the IJ actually exercised his discretion and whether he did so in an arbitrary and capricious manner. Abedini, 971 F.2d at 193. The IJ need only support his conclusion with a "reasoned explanation based on legitimate concerns." See id.
 
 
 37
 Section 101(f)(6) of the Act states that "one who has given false testimony for the purpose of obtaining any benefits under [the Act]" cannot be regarded as possessing "good moral character" and thus is statutorily ineligible for voluntary departure. 8 U.S.C. § 1101(f). The IJ found that Fisher lacked "good moral character" because she entered into a sham marriage with Charles. He supported this finding with a "reasoned explanation" by considering Charles's affidavit and Fisher's preparation for her interview with the INS. Fisher asserted that she did not know that someone paid Charles $500 to marry her, and that she had legitimate reasons for having notes containing the answers to questions the INS would ask her at her interview. The IJ, however, found Fisher's testimony concerning her marriage not credible, and we must afford this finding "substantial deference." De Valle v. INS, 901 F.2d 787, 792 (9th Cir.1990) (internal quotations omitted). Based on the record, we cannot say that the IJ's denial of voluntary departure is not supported by a "reasoned explanation based on legitimate concerns."
 
 
 38
 Fisher argues that the IJ's decision is "arbitrary and capricious" because the IJ relied on hearsay evidence--Charles's affidavit. She cites Cunanan v. INS, 856 F.2d 1373 (9th Cir.1988), for the proposition that the IJ abuses his discretion when he relies on hearsay evidence, because such out-of-court statements preclude the petitioner from confronting her witnesses. Cunanan, however, recognizes that "[i]n deportation proceedings, the test for admissibility is whether the hearsay statement is 'probative' and whether its admission is 'fundamentally fair.' " Id. at 1374, quoting Baliza v. INS, 709 F.2d 1231, 1233 (9th Cir.1983) (Baliza ).
 
 
 39
 The affidavit was clearly probative of an issue in the case; the question is whether it was fundamentally unfair for the IJ to rely on it. In Baliza, we held that admission of a hearsay affidavit was fundamentally unfair because the government made no reasonable effort to produce the declarant. Baliza, 709 F.2d at 1234. Here, the INS made reasonable efforts to find Charles before the hearing. In addition, Fisher's counsel could have objected to the IJ's reliance on the available evidence. The IJ stated that "the case will just have to stand on the evidence." He then said that "if either party wishes to question [Fisher] about her role in [the marriage], that's fine.... I'll consider that [testimony] as well." In response, Fisher's counsel stated, "That's what I'd like to do, Your Honor," and he proceeded to elicit testimony from Fisher. The IJ's reliance on Charles's affidavit was not "fundamentally unfair" under these circumstances.
 
 
 40
 PETITION DENIED.
 
 
 41
 CANBY, Circuit Judge, joined by THOMPSON, Circuit Judge, concurring in the judgment:
 
 
 42
 I agree with the result reached by the majority, but write separately to emphasize a crucial aspect of this case. At oral argument, Fisher's counsel expressly disavowed any claim that Fisher was persecuted or feared persecution on account of her gender, or that persecution of women could constitute persecution "on account of ... membership in a particular social group " within the meaning of 8 U.S.C. § 1101(a)(42)(A).
 
 
 43
 This essential fact must be taken into consideration in assessing Judge Wallace's majority opinion. There is no issue of gender discrimination before our en banc court. The majority opinion should not be read as establishing that enforcement of criminal laws against women, or the infliction of suffering upon women, because they are women cannot constitute persecution under the Act. All that properly can be said is that the enforcement of criminal laws against Fisher because she is a woman does not, on this record, constitute persecution on grounds of religion or political belief--the only two grounds urged by Fisher.
 
 
 44
 Judge Wallace's opinion convincingly demonstrates that substantial evidence supports the Board's finding that Fisher was not persecuted, and did not have a well-founded fear of persecution, on account of her two asserted grounds of religion or political belief. I do not join the opinion, however, because it may too easily be misinterpreted as deciding, without briefing or argument, the important claim that it concedes Fisher did not raise: whether persecution of women because they are women is a ground for asylum under the Act.
 
 
 45
 There are several statements in Judge Wallace's majority opinion that could be misinterpreted as foreclosing the possibility that persecution of women on account of their gender presents a ground of asylum under the Act. Two of the clearest follow:
 
 
 46
 Because Fisher has demonstrated only discrimination on account of her sex, not persecution on account of her religious or political beliefs, she has failed to carry her burden under Ghaly. Persecution on account of sex is not included as a category allowing relief under section 101(a)(42)(A) of the Act.
 
 
 47
 79 F.3d at 963. Again, in a similar vein, the opinion states:
 
 
 48
 A law permitting the mere detention, arrest, or even imprisonment of a woman who does not wear the chador in Iran does not constitute persecution any more than it would if the same law existed in the United States. Persecution requires the government actor to inflict suffering on account of an individual's religious or political beliefs, race, nationality, or membership in a particular social group.
 
 
 49
 79 F.3d at 962.
 
 
 50
 These passages may be read as ruling on an issue of law that is not before us. Whether persecution directed at women constitutes persecution "on account of ... membership in a particular social group" within the meaning of section 1101(a)(42)(A) is an arguable point,[1] but it has not been argued or briefed in this case. The issue is not before us. Presumably these gratuitous statements on the merits of the question are dicta, but they should be left unsaid.
 
 
 51
 Nor can I embrace the majority opinion's treatment of a quotation from Abedini v. INS, 971 F.2d 188 (9th Cir.1992). Abedini ruled that persecution was not established by showing a possibility of "prosecution for an act deemed criminal in Iranian society, which is made applicable to all people in the country." Id. at 191. The majority opinion substitutes "all [women]" for "all people," 79 F.3d at 966, implying that there is no material difference between the two classes. Again, any implication that laws targeting women are no different from laws generally applicable to everyone must be dictum, but we should not express a view on the subject until it is briefed and argued to us in a case that turns on the point.
 
 
 52
 The case before us is a simple one when we restrict ourselves to the arguments properly before us. Fisher contends that Iranian authorities persecuted her, and she fears future persecution, on account of her religion or her political beliefs. She did not establish persecution, or a well-founded fear of persecution, on either of those grounds. No more need be said regarding the merits of her asylum claim. I agree that the immigration judge's denial of voluntary departure was not arbitrary or capricious. I therefore concur in the denial of Fisher's petition for review.
 
 
 53
 NOONAN, Circuit Judge, joined by FLETCHER, Circuit Judge, dissenting:
 
 
 54
 To begin with, the petitioner identified herself at the immigration hearing as Saideh Hassib-Tehrani. Despite the fact that the INS and this court have continued to identify her as "Fisher," that appellation seems cruelly ironic when the majority denies that she was ever validly married to Fisher. It is always appropriate to refer to people by the names they give themselves. Consequently, in this dissent Saideh Hassib-Tehrani will be identified by the name she calls herself.
 
 
 55
 On October 5, 1994 a panel of this court unanimously remanded to the Board of Immigration Appeals (the Board) for further consideration of two claims: one, that Saideh Hassib-Tehrani feared persecution on account of her religious beliefs, and two, that she feared persecution on account of imputed political opinion. 37 F.3d 1371, 1383 and 1384. The panel did not decide that she was entitled to asylum on these grounds. It only decided that the Board had failed to analyze the evidence that supported asylum on these grounds. Today the majority opinion denies her petition on the ground that substantial evidence supports the Board's decision. However, the Board determined only that the petitioner's encounters with the regime did not amount to persecution without considering whether she had established a well-founded fear of persecution were she returned to Iran. I agree with the original panel that the case should be remanded to the Board for further consideration. The majority opinion now leaves open the possibility that she could move to reopen the proceedings before the Board pursuant to 8 C.F.R. §§ 3.2, 208.19 (1995). For a reason now to be stated, it is evident that reopening of the deportation proceedings should be acceptable to the government and granted by the Board. The principal division in this court is as to whether we should remand requiring reconsideration or whether the reopening should be left to the discretion of the government and the Board.
 
 
 56
 The Sea-Change In Government Policy. A compelling reason that either remand or reopening should occur is that this case occurs in a kind of time warp in which governmental policies, now abandoned by the government, operate to decide the case. The decision of the Immigration Judge was given in 1987. The decision of the Board was given in 1990. The decision of the panel was given in 1994. On May 26, 1995 a new approach to the basic problems present in this case was announced by the INS Field Operations Office of International Affairs in the Department of Justice. Addressed to "All INS Asylum Office/rs" and entitled "Considerations for Asylum Officers Adjudicating Asylum Claims From Women," reprinted at 72 Interpreter Releases 781 (June 5, 1995) (hereinafter "Considerations"), the policy is set out in a public document and given a large and appropriate amount of attention in the media. See, e.g. Michael Sniffen, U.S. Stresses That Sexual Persecution Can be Basis for Asylum, The Associated Press, May 26, 1995, AM Cycle; Ashley Dunn, U.S. to Accept Asylum Pleas for Sex Abuse, N.Y. Times, May 27, 1995, at 1. The Considerations are put forward as "required reading for all interviewing and supervising Asylum Officers". Considerations at 18 (emphasis in original). Training in these guidelines is required in order to enhance the ability of Asylum Officers "to make informed, consistent and fair decisions." Id. at 19. Supervisors of Asylum Officers are to be held accountable "for assuring that Asylum Officers fully implement this guidance." Id.
 
 
 57
 Under the heading "Background and International Guidance" the Asylum Officers are told: "The evaluation of gender-based claims must be viewed within the framework provided by existing international human rights instruments and the interpretation of these instruments by international organizations." Id. at 2 (emphasis supplied). Among the international documents then cited are the 1979 Convention on the Elimination of All Forms of Discrimination Against Women and the 1993 Declaration on the Elimination of Violence Against Women, adopted by the General Assembly of the United Nations. According to the guidelines, the Declaration recognizes violence against women "as both a per se violation of human rights and as an impediment to the enjoyment by women of other human rights." Id. at 2. A third document cited by the Considerations was adopted by the Executive Committee of the United Nations High Commissioner for Refugees in 1985 and, as summarized by the Considerations For Asylum Officers, declares that states were free to adopt the interpretation "that women asylum-seekers who face harsh or inhuman treatment due to their having transgressed the social mores of the society in which they live may be considered a 'particular social group' " for asylum purposes. Id. at 3. In other words, this whole class of women is eligible for asylum consideration as persons persecuted on account of their membership in the social group of nonconforming and therefore harshly treated women. This conclusion is reinforced by reference to the Guidelines adopted in 1993 by the Canadian Immigration and Refugee Board which formally recognize that "women fleeing persecution because of their gender can be found to be refugees." Id.
 
 
 58
 Against this background of international guidance, Asylum Officers of the United States are instructed that the laws and customs of some countries
 
 
 59
 "contain gender-discriminatory provisions. Breaching social mores (e.g., marrying outside of an arranged marriage, wearing lipstick or failing to comply with other cultural or religious norms) may result in harm, abuse or harsh treatment that is distinguishable from the treatment given the general population, frequently without meaningful recourse to state protection. As a result, the civil, political, social and economic rights of women are often diminished in these countries."
 
 
 60
 Id. at 4. The Asylum Officers are instructed that claims must be analyzed under the laws of the United States "but gender-related claims can raise issues of particular complexity, and it is important that United States asylum adjudicators understand those complexities and give proper consideration to gender-related claims." Id. at 8. In particular, it is stated that persecution occurs when oppression is inflicted "because of a difference [that] the persecutor will not tolerate," citing Hernandez-Ortiz v. INS, 777 F.2d 509, 516 (9th Cir.1985), and that discriminatory practices and experiences "can accumulate over time or increase in intensity so that they may rise to the level of persecution." Considerations at 9 (quoting U.S. Department of Justice, Immigration and Naturalization Service, Basic Law Manual at , reprinted in Charles Gordon and Stanley Mailman, 8 Immigration Law and Procedure (rev. ed.1995)). The contrary-to-fact hypothetical indulged in by the majority (a law in the United States not constituting persecution of a social group although permitting detention, arrest "or even imprisonment" of a woman for not wearing a chador) suggests that these guidelines have not been assimilated by this court.
 
 
 61
 The guidelines go on to cite in particular the panel opinion in this very case at a time when rehearing en banc was pending. Id. at 10. Without the slightest criticism of the analysis and conclusions reached by the panel, the guidelines quote the panel at 37 F.3d at 1379 emphasizing that persecution should not be evaluated "solely on the basis of the physical sanction" and that requiring a person with religious views different from those espoused by a religious regime to conform to the regime's laws when the laws are fundamentally abhorrent to that person's religious convictions could result in anguish amounting to persecution. The Considerations further note that a woman could have imputed to her a political opinion about laws based on gender--a political opinion which would be the basis of persecution by those enforcing the regime's views. The Considerations quote with approval the Board's statement in Matter of Acosta, 19 I & N Dec. 211, 233 (March 1, 1985), that persecution on account of membership in a particular social group had to be based on those who "share a common, immutable characteristic. The shared characteristic might be an innate one such as sex...." Considerations at 12. The Considerations leave open whether, under existing precedent, "gender might be one characteristic that combines with others to define the particular social group." Considerations at 13. The guidelines are an invitation to develop asylum law with special attention to the problems of women oppressed on account of their nonconformity with the moral codes of a rigorist regime.
 
 
 62
 As Judge Canby's concurrence observes, the case as governed by the guidelines has not been presented to us and so cannot now be decided by us. The majority of the en banc panel reaching out to decide what it has no power to decide speaks of course for those making up this majority. Its dicta do not constitute Ninth Circuit law. It is this particular majority which has the view that if in the United States a law imposed a religiously-inspired dress code on all women under penalty of imprisonment the law would not be evidence of persecution of a particular social group. If only there is a law, if only the law is general enough, half of the population may be subjected to discrimination and subject to incarceration for disobedience to the discriminatory regulation. We are not very far from The Handmaid's Tale when seven judges of this court are capable of expressing such a view.
 
 
 63
 In oral argument the court inquired of counsel representing the government whether he was in agreement with the guidelines of May 1995. After a pause, counsel said that he was sure his client was in agreement with them. This answer cannot be faulted for its honesty, but it suggests that there are elements in the INS who have not assimilated the spirit of the new guidelines. It would be tragic if government policy towards a woman claiming persecution or fear of persecution today should be decided on the basis of a policy that has become obsolete. There is no unfairness to the petitioner in letting the new guidelines apply to her case. There is no unfairness to the government in suggesting that it follow its new rules. This case was presented, argued and decided without any attention whatsoever to the guidelines that Asylum Officers today are supposed to "fully implement" and that are important to "informed, consistent and fair decisions." What advantage accrues to the government in avoiding the Considerations? This case needs to be heard again with the Board free to follow the guidelines of May 1995. If the majority agreed that this case should be remanded because the Board erred, that would be possible; because the majority does not, reopening is the path to achieving this objective. The Board has the discretion to reopen, and the present policy of the government indicates that it would be a proper exercise of the Board's discretion to do so.
 
 
 64
 We turn to the case as it has been presented to us.
 
 
 65
 Saideh Hassib-Tehrani's Fear. The statute itself establishes that what must be shown by a person seeking asylum is something less than what is required by the standard for withholding of deportation. The higher standard for withholding requires showing something that is more probable than not. The standard for showing fear is less. INS v. Cardoza-Fonseca, 480 U.S. 421, 427-32, 107 S.Ct. 1207, 1211-14, 94 L.Ed.2d 434 (1987), Singh v. Ilchert, 69 F.3d 375, 381 (9th Cir.1995). There is a grave temptation for judges, used as they are to determinations of probability, to invoke unconsciously the higher standard in assessing fear. The Supreme Court reminds us that a chance of one-in-ten of serious harm befalling one is enough to establish fear that qualifies for asylum. Cardoza-Fonseca, 480 U.S. at 440, 107 S.Ct. at 1217.
 
 
 66
 The common teaching of this circuit is that fear has a subjective component and an objective component. The dichotomy is easy to state but not so easy to grasp. Fear is an emotion. As an emotion it must be subjective. Our requirement of an "objective" component reflects the judicial desire to have some way of checking on whether a fear is imaginary or fantastic. We have spoken in terms of evidence showing a credible, direct and specific basis for the fear. Prasad v. INS, 47 F.3d 336, 338 (9th Cir.1995). We still must integrate that credible, direct and specific basis with the subjective reaction of the person who says that she is scared.
 
 
 67
 In this case, the claim is not that Saideh Hassib-Tehrani has suffered persecution but that she fears that if she is returned to Iran she will suffer persecution. No one doubts the genuineness of her emotion. Does she have a credible, direct and specific basis for this fear? She cites three bad things that happened to her before she left her native country. Found in mixed company where the host wore his swimsuit she was arrested, handcuffed, taken to a government center, and held for four hours; her name and address were taken. The experience was traumatic ("they hurt me"), and she became depressed, ill and unable to continue with her valued job as a teacher. Subsequently, caught with strands of hair outside her chador, she was seized upon the street by government agents or government-approved vigilantes, put into a car at gunpoint, lectured on her clothing, and driven to her home. Later in the year her home was actually invaded by government agents searching for suspected enemies of the government. None of the incidents in themselves are of such gravity that they constitute persecution. As credible, direct, specific facts which make her fear persecution if she returns to Iran, the incidents have a different significance. They indicate to her that the authorities know about her, know that she has been a nonconformist on points of great importance to the authorities and foretell that she will suffer more serious harm if she is returned to the country.
 
 
 68
 The Board stopped its analysis with its finding that she had not suffered persecution in the three incidents. The Board did not address her fear of persecution in the future. The Board focused on her opinions as they had been expressed in Iran. But this focus was as inappropriate as was the Board's stopping at past persecution.
 
 
 69
 The structure of the statute authorizing asylum is modelled on the Fifteenth Amendment to the Constitution prohibiting the denial of rights "on account of" race, color or previous condition of servitude. Persecution must be "on account of" a characteristic belonging to the victim. INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 815-16, 117 L.Ed.2d 38 (1992). That elementary proposition does not eliminate from consideration the view that the alleged persecutors take of the victim. See Mendoza Perez v. INS, 902 F.2d 760, 762 (9th Cir.1990).
 
 
 70
 For example, it is the conjunction of the victim's political opinion and religious belief, as perceived by the persecutors, with the persecutors' reaction to that opinion or belief, which produces persecution. So, as the Supreme Court tells us, Jews in Nazi Germany were not persecuted on account of their political opinion. Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815-16. Rather, they were persecuted as members of a particular group variously viewed as religious, ethnic, or social by the Nazis. The Jews did not need to raise a finger against their persecutors, or whisper a criticism, in order to be the maligned objects of hatred. Similarly, what befell Saideh Hassib-Tehrani was not because she had demonstrated a sympathy for feminism or voiced a more tolerant interpretation of Islam than the Ayatollah's or expressed in Iran any dissent from the rigorist regime. The arrests and search occurred because the regime perceived her as a religious nonconformist. The way in which she led her daily life was enough to invite repression. It was on account of her religious opinion, as perceived by the regime viewing her unconventional routine behaviors, that she was arrested and that she foreseeably will face more serious repression if she returns. See Abedini v. INS, 971 F.2d 188, 192 n. 1 (9th Cir.1992). As Iran is a theocracy, the religious beliefs imputed to her by the regime were also political opinions, and the persecution she fears from the regime would also be "on account of" those imputed political opinions.
 
 
 71
 In this case Saideh Hassib-Tehrani has testified that she is a Muslim but that she does not believe that the government is a truly Muslim regime. She reaches that belief from "the way they treat people, the covering of the face, the way of life." She is opposed to the regime's fundamentalist beliefs and so invites persecution. Her views, which have been made public in the course of these proceedings are not concealed from the Iranian authorities. See Bastanipour v. INS, 980 F.2d 1129, 1133 (7th Cir.1992). If we wished to discount expression of opinion offered by a petitioner during a hearing, we should seal the record and disguise the petitioner's identity in our published reports. If the testimony in an asylum proceeding is not shielded from the government of the country to which a person may be returned, it is only fair to take that testimony into account in determining whether a petitioner has a basis for believing that the government will persecute her if she is returned. According to her testimony in this case Hassib-Tehrani has a political opinion and religious beliefs on account of which she can reasonably fear persecution.
 
 
 72
 What kind of trouble is she likely to receive at the hands of the government if she goes back? What is she scared of? We begin with the information in the administrative record by virtue of its incorporation of the detailed information on Iran provided by the United States Department of State to the Committee On Foreign Relations, U.S. Senate, and the Committee on Foreign Affairs, U.S. House of Representatives, in the State Department's Country Reports on Human Rights Practices for 1986 (1987) (hereafter "the 1986 Country Report"). According to this official information, Iran was not a country without laws and procedures. It was a country in the grip of righteous religious revolutionaries, intolerant of even the slightest departure from the norms that they believed required by the Koran. It was a country in which vigilantes, with government approval, enforced the dress code and other matters of gender decorum. It was a country where, once in the hands of police or prison officials, there was no effective restraint on arbitrary infliction of suffering. According to the 1986 Country Report, a person in Saideh Hassib-Tehrani's position faced arrest by revolutionary guards, prolonged detention, interrogation under torture, imprisonment, and arbitrary beatings on the soles of her feet. The government has produced no evidence that these conditions have changed.
 
 
 73
 The majority in this case says that we cannot use the 1986 Country Report because it did not form part of the administrative record. That is not entirely accurate. The immigration judge did use a portion of this report in making his decision, as the majority concedes. 79 F.3d at 964. This use of the report makes it part of the record. Cf. 8 C.F.R. § 208.9(f) ("The application, all supporting information provided by the applicant, any comments submitted by the Department of State, or by the Service, and any other information considered by the Asylum Officer shall comprise the record.") (emphasis added). In addition, by using the report, the immigration judge brought into play the following regulation that governs immigration hearings:
 
 Comments from the Department of State
 
 74
 (a) At its option, the Department of State may provide detailed country conditions information addressing the specific conditions relevant to eligibility for refugee status according to the grounds specified in section 101(a)(42) of the Act, 8 U.S.C. 1101(a)(42). Any such information relied upon by an immigration judge in deciding a claim for asylum or withholding of deportation shall be made part of the record and the parties shall be provided an opportunity to review and respond to such information prior to the issuance of a decision.
 
 
 75
 8 C.F.R. § 208.11 (1995). It is apparent that the State Department's Country Reports are "detailed country conditions information" within the terms of this regulation. The term "information" in the second sentence cannot be isolated from the whole phrase qualifying "information". That being so, it is not the specific detail relied on by the immigration judge but the "detailed country conditions information," or "Country Report" that is made part of the record. Consequently, the 1986 Country Report is properly before us.
 
 
 76
 In summary, we are asked in this en banc court to decide whether the Board had substantial evidence for concluding that Saideh Hassib-Tehrani had fear, and reason to fear, persecution on account of her religious beliefs and political opinion if she were now deported to Iran. In the end, in deciding that question we are required to integrate the objective evidence with her subjective emotions and to ask whether a person with her experiences, who fell ill after being handcuffed and detained for four hours, would be scared of suffering on account of her now openly expressed opposition to the regime if she were sent back. In Bastanipour, Judge Posner asked the government's lawyer "whether he would fear persecution by Iran if he were in Bastanipour's religious and political shoes and he conceded that he would." Bastanipour, 980 F.2d at 1133. We did not ask the government lawyer a similar question but we should ask ourselves: If we had the beliefs and the experience and the gender of Saideh Hassib-Tehrani, would we reasonably fear that we had a one-in-ten chance of suffering seriously on account of our beliefs if we returned to Iran? The answer, it may be suggested, is obvious. If it is obvious, the Board necessarily erred in its contrary finding.
 
 
 77
 On Remand or Reopening. There is more that should be before the Board on remand or reopening. Under the governing statute the immigration judge conducting the deportation proceedings "shall determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine and cross-examine the alien or witnesses." 8 U.S.C. § 1252(b). In this role, the immigration judge has duties imposed by statute that are different from the functions of an Article III judge. He has the specific duties of interrogating, examining and cross-examining, and he also has the duty of presenting evidence. In short, the immigration judge has the duty of developing the record on which his or her decision must be based. Id. For that reason the immigration judge for these purposes is also described as a "special inquiry officer." Id.; see also 8 C.F.R. § 1.1(l ).
 
 
 78
 These statutory obligations put the immigration judge in a position analogous to that of an administrative law judge hearing a Social Security claim. The immigration judge has, analogously, the "special duty to fully and fairly develop the record." See Brown v. Heckler, 713 F.2d 441, 443 (9th Cir.1983). Like the administrative law judge the immigration judge has the obligation to be informed about the facts relevant to the decision being made. Heckler v. Campbell, 461 U.S. 458, 471, n. 1, 103 S.Ct. 1952, 1959 n. 1, 76 L.Ed.2d 66 (Brennan, J., concurring) (1983).
 
 
 79
 In a case such as the one at bar the information available from the State Department on the country conditions is obviously relevant; and the relevant information stands in need of updating with the passage of each year. As the majority opinion notes, it should be open to Saideh Hassib-Tehrani to reopen the proceeding before the Board to present the most relevant up-to-date information from the State Department on conditions in Iran. Why should the Board adjudicate about conditions in a far-away land without getting the most reliable kind of information, information all the more acceptable because it comes from an agency of the United States? The government has no reason to resist such a reopening. The government is not the enemy of the alien. Its interest is that the asylum-seeker should obtain asylum if she is entitled to it. The Country Reports bear on this entitlement.
 
 
 80
 Unlike most questions litigated in federal court, the most relevant questions in an asylum proceeding depend on knowledge of conditions in some foreign land. The Board should not stultify itself by denying itself the benefit of responsible reports on the country in question. When a judge decides about issues within the United States the judge necessarily puts to use a vast fund of knowledge gained through experience of living in this country; and that experience does not form part of any administrative record. Lacking such experience of tyrannical regimes abroad, the Board is free to consult not only the Country Reports issued by the State Department but also responsible information from other sources. The special inquiry officer is specifically authorized to do so. 8 C.F.R. § 208.12(a). When the special inquiry officer has not, and when the information in the administrative record is eight years old, the Board should welcome the submission of up-to-date Country Reports.
 
 
 81
 Involuntary Departure. Although it might be hoped that the issue will never need to be finally resolved, the possibility exists that Saideh Hassib-Tehrani will be returned to Iran because the Immigration Judge found that she gave false testimony at the immigration hearing. On this point the Board made no findings of its own but simply adopted the Immigration Judge's findings. Consequently it is our task to look at them.
 
 
 82
 The Immigration Judge found Saideh Hassib-Tehrani to be "lying" when she testified that she had been married to Charles Fisher. A.R. at 44. The evidence given weight by the Immigration Judge consisted of two things: an affidavit of Charles Fisher and notes that Saideh Hassib-Tehrani had prepared for her hearing. The notes were amazingly non-probative of deceit. As the majority observes, the notes contained information such as her parents' home town, birth date and her place of work. She was certainly not going to lie about these matters. The fact that she had notes about her life with Fisher seems to fall within her own explanation for all the notes, viz. that she had a poor memory and was nervous and wanted to have all the facts at her fingertips when she testified.
 
 
 83
 Fisher's affidavit read as follows: "I was given $500.00 to marry my wife Saideh from a friend named Rick Ronquillo, Amalco Metals employee. That if I married Saideh from Iran, that I would receive $500.00 cash. From her cousin Bob. I have not resided with Saideh on continuios [sic] basis sense [sic] our marriage." The background of this affidavit is provided by Saideh Hassib-Tehrani herself. She came to the United States expecting to marry Bob. She found him living with another woman. Bob had every reason to try to find someone to take his place, and he did. Bob's solution of a sad situation does not reflect on the credibility or the moral character of Saideh Hassib-Tehrani.
 
 
 84
 What does Fisher's affidavit prove? It proves that Fisher believes that he had married Saideh Hassib-Tehrani. It implies that he had resided with her. It is not probative of a fake marriage. It reveals nothing about whether Saideh Hassib-Tehrani knew of Fisher's motive and whether therefore her testimony that the marriage was not one entered into for immigration purposes was false; indeed, nothing in the record suggests that she even knew about the payment, much less caused Bob to make it. The affidavit invites interrogation. Saideh Hassib-Tehrani's testimony explains why cousin Bob had offered Fisher $500.00. The monetary motivation for the marriage does not establish that it was invalid or fictitious. No doubt all should marry for love; but many marriages in the history of the world have been entered for mercenary motives. Without substantial evidence in the record supporting the Immigration Judge's determination, there should be a grant of voluntary departure.
 
 
 
 [1]
 See, e.g., Matter of Acosta, 19 I & N Dec. 211 (BIA 1985), defining the term "particular social group" as "a group of persons all of whom share a common, immutable characteristic" and opining that "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties...." Id. at 233 (emphasis added). See also Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir.1993) (petitioner who establishes fear of persecution in Iran because she is a woman has identified a requisite "particular social group" for purposes of asylum)