Surender Jeet SINGH, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 03–71868.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 2004.

Filed Dec. 23, 2004.

2003), is vacated.

Joseph Siguenza, Ashwani Bhakhri, Burlingame, CA, for the petitioner.

Jennifer Levings, Assistant United States Attorney, Washington, DC, for the respondent.

Before B. FLETCHER, NOONAN, and THOMAS, Circuit Judges.

NOONAN, Circuit Judge.

Surender Jeet Singh petitions for review of the decision by the Board of Immigration Appeals (the Board), denying him asylum, withholding of deportation, and relief under the Convention Against Torture (CAT). Holding that the Board's credibility determination cannot be sustained, we remand.

## FACTS

Singh, a native of India, was raised as a Sikh and practices the Sikh religion. According to his testimony, he was recruited by an organ of the government of India known as the Research and Analysis Wing (RAW), situated in the office of the Prime Minister. Its functions, he testified, were like those of the CIA. As an agent of the RAW, he made reports on individuals believed to be Sikhs working to establish the separate Sikh state of Khalistan. He investigated about three persons a year over a period of thirteen years. He submitted postal receipts that he said showed his mailings to the RAW. He quit when ordered to aid in the assassination of a very religious person he had investigated. After hiding with friends for a year, he used his own passport to come to the United States. He testified that he would be killed if returned to India.

Finding him not credible, the Immigration Judge denied Singh's application. Singh appealed. The Board, acting

through a single member, affirmed the decision of the immigration judge finding him not credible. The Board stated as to the RAW:

> ... the respondent has presented no corroborative evidence whatsoever of the existence of this Indian government agency that is similar to the CIA and operates internationally. Despite the secrecy surrounding the operations of the CIA and other security agencies worldwide, it is not difficult to find evidence of their existence. Yet the respondent would have the Immigration Judge or the Board grant asylum based simply on his tale of being an agent for an organization that spies on and assassinates religious minorities, perhaps worldwide.

Singh appeals.

## ANALYSIS

■ We review the Board's decision. That decision did not address the possible statutory bar to Singh's asylum. It focused on the absence of proof of the existence of the RAW as necessary corroboration of Singh's story. The "tale," the Board said, lacked corroboration. The Board did not acknowledge that the RAW existed.

The RAW does exist. It is under the office of the Prime Minister of India. It does engage in counterterrorism.

It has been suggested that we cannot take notice of the RAW's existence and operations because we are limited in our review to the administrative record upon which the deportation order is based and the Attorney General's findings of fact. 8 U.S.C. § 1252(b)(4); *Fisher v. INS*, 79 F.3d 955, 963 (9th Cir.1996) (en banc) (citing the predecessor statute 8 U.S.C. § 1105a(a)(4)). But it is nonsense to suppose that we are so cabined and confined that we cannot exercise the ordinary power of any court to take notice of facts that are beyond dispute. We can notice that the government of India exists. We can notice that the office of the Prime Minister of India exists. We can notice that a part of the Prime Minister of India's office is the RAW.

Federal Rule of Evidence 201 permits us to take notice of any "adjudicative" fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." As a matter of course we have taken judicial notice that Japan has a constitution, a legislature that creates statutes, and a court system that gives judicial decisions and operates by means of lawyers. *Dulles v. Katamoto*, 256 F.2d 545, 547 (9th Cir. 1958); *cf. Quinn v. Robinson*, 783 F.2d 776, 813 (9th Cir.1986) ("We do not ignore the constitutional, legal, and military relationship between England and Northern Ireland. The ties are so well established, *see generally* 1 *Europa Year Book 1984*, at 991–96; 14 *World Book Encyclopedia* 403–06b (1985 ed.), that had evidence of the relationship not been presented to the magistrate, judicial notice would have been appropriate.").

The statutory authorization, already broad, has been interpreted even more extensively in the context of appellate review of an agency. Under the heading "Judicial Notice is Expanded in Administrative Proceedings," the magisterial textbook of Judge Jack B. Weinstein states:

> When a court reviews an administrative determination to find if it is adequately supported by the record, the court should use the scope of administrative notice authorized, rather than its own more narrowly subscribed notice. The

court should place itself in the same position as the administrative board.

Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 201.02[4] (2d ed.2004) (footnotes omitted).

Every case "involves the use of hundreds or thousands of non-evidence facts." Fed.R.Evid. 201 advisory committee's note (proposed draft 1972) (paraphrasing Kenneth Culp Davis, "A System of Judicial Notice Based on Fairness and Convenience," in *Perspectives of Law* 69, 72–73 (Roscoe Pound et al., 1964)). Administrative cases and the review of administrative decisions are no exception to this universal truth. An agency or an appeals court could not function if it had to depend on proof in the record of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed.R.Evid. 201(b).

The language of the statute speaking of the administrative record must be interpreted in the context of the Federal Rules of Evidence, the general practice of administrative review, *Dulles* and the common practice of the courts. The language in *Fisher* repeats the statutory language and does not enhance its range. Its thrust is to exclude from our consideration the kind of facts contained in the country reports of the State Department unless the reports have been introduced into the record. *See Fisher*, 79 F.3d at 963 (citing cases and overruling some cases and parts of other cases that took judicial notice of country conditions reports).

The existence and operations of the RAW are readily known by the employment of an accessory tool as familiar in legal research today as Shephard's Citations were half a century ago. A simple Lexis search reveals over 1,500 articles on the RAW from reputable international media sources including the BBC. Its situation in the office of the Prime Minister is a matter of common knowledge. *See* Ejaz Akran, *A Comparison of the Structures and Functions of Intelligence Organizations in Israel and India*, 23 Journal of South Asian and Middle Eastern Studies 59, 70 (Spring 2000). As early as 1987, the *New York Times*, reporting on the Indian Army's unsuccessful incursion into Sri Lanka, ended its report from New Delhi: "Military analysts here say the main failure was that of the Research and Analysis Wing, India's intelligence agency." Steven R. Weisman, *Toll in Sri Lanka Shakes India Aides*, N.Y. Times, Nov. 1, 1987, Sec. 1 at 4. Even the Encyclopedia Britannica acknowledges the existence of the RAW: "India's most important intelligence agency is a civilian service, the Research and Analysis Wing ("RAW"). The RAW's operations are primarily aimed at the Indian subcontinent, though it also has directed efforts in the United States aimed at influencing that government's foreign policy." 21 *Encyclopaedia Britannica* 787 (15th ed.2003).

A former member of the Cabinet Secretariat and of the National Security Advisory Board of India, Bahukutumbi Raman, has testified at length to Congress on terrorism to which India has been subjected from 1956 to the present and the measures taken by India against it. Raman's biographical data, submitted to Congress, identified him as moving from the Indian Police Service in 1984 to a permanent post in the Cabinet Secretariat and as serving from 1988 to 1994 as "head of the Counterterrorism division of the Research & Analysis Wing (R & AW), India's external intelligence agency." *The Challenge of Terrorism in Asia and the Pacific: Joint Hearing Before the Committee on International Relations*, 108th Cong. 21 (2003) (statement submitted by Bahukutumbi Raman).

■ If this case had involved an agent's claimed membership in an agency more well-known in the United States, such as Interpol or the KGB, the IJ or BIA would not have required evidence of their existence. The issue simply would not have arisen because the IJ or BIA would have unconsciously taken notice of the fact of those agencies' existence. Judicial notice is appropriate in exactly this circumstance—to ensure that administrative or judicial ignorance is not insulated from review through hyper-technical application of the general rule that the court can consider only evidence considered by the Board. *Fisher*, 79 F.3d at 964.

We are compelled to reverse an adverse credibility finding by the Board whose centerpiece is lack of evidence of the existence of the RAW.

Petition GRANTED. The case is REMANDED to the Board