# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MUSTAFE MUSE JIBRIL,
                        *Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney
General,
                        *Respondent.*

No. 03-72118

Agency No.
A75-596-958

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 5, 2005—Pasadena, California

Filed September 19, 2005

Before: Diarmuid F. O'Scannlain and Johnnie B. Rawlinson,
Circuit Judges, and Robert H. Whaley,* District Judge.

Opinion by Judge O'Scannlain

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft,
as Attorney General of the United States, pursuant to Fed. R. App. P.
43(c)(2).

*The Honorable Robert H. Whaley, United States District Judge for the
Eastern District of Washington, sitting by designation.

## COUNSEL

Salvador Colon, Fong & Associates, Houston, Texas, argued the cause for the petitioner. Ali. M. Onan was on the briefs.

Teal Luthy Miller argued the cause for the respondent. Peter D. Keisler, Assistant Attorney General, Robert M. Loeb and Deborah Ruth Kant, U.S. Department of Justice, Washington, D.C., and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, were on the briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether, under our case law, an immigration judge's adverse credibility finding is supported by the alleged implausibilities and inconsistencies in an asylum applicant's testimony and by his purportedly evasive and unresponsive demeanor while testifying.

I

Mustafe Muse Jibril is a member of the Yibir, a disfavored minority clan without land or power in Somalia, who has applied for asylum in the United States. According to his application, his clan is "the lowest clan," "scattered all over the country but . . . in the minority everywhere," they "hold no territory" and "have no militias to protect [them]." The

Yibir are "considered outcasts even though [they] share the same language, culture and traditions and look the same as every one else in Somalia" and "cannot marry outside [the] clan because [they] are beneath the other clans." These facts are supported by the Department of State's Country Report.

Before the civil war that toppled the government of President Siad Barre, Jibril's father was a lieutenant-colonel in the army. President Barre promoted members of minority clans because they had no natural loyalties to the more powerful tribes and could be trusted to serve the regime loyally in exchange for government protection. After the Barre government collapsed, Jibril and his family feared retribution from majority clan militia because of his father's position under the former regime. The Country Report describes the risk of revenge attacks against "senior security or military officials of [Barre's] regime."

In March of 1991, after the fall of the government and in the face of imminent attacks from the United Somali Congress ("USC") militia, ten members of Jibril's family packed their belongings into a pick-up truck and fled to Kenya. Because of the limited room in the truck, Jibril and his brother stayed behind to collect more belongings with the intention of following two days later.

The next night, however, Jibril and his brother heard gunfire in the street and saw a vehicle flying the USC flag pull up outside their house. They hid behind the front door, but the USC opened fire on the house, killing Jibril's brother and wounding Jibril in the stomach area. He fell inside the entrance, bleeding from his stomach, with his brother's body over his legs. When the militia soldiers entered the house, he closed his eyes and feigned death while he was kicked several times in the side. Satisfied that he was dead, the militia looted the house, taking bags of clothes, jewelry and money that the family had not taken with them. Jibril observed that the militia wore civilian clothes—one wearing a traditional Somali

skirt—and carried Kalashnikov rifles. One solider carried a rocket launcher. He also overheard their accents and some of their conversation.

After about half an hour to an hour, the militia left, giving him two final, hard blows to the head, during which he again refrained from responding. The next morning, about seven hours after he was shot, Jibril was found by neighbors who took him to a local school, which had been converted to a hospital by western volunteer doctors. Jibril was given a blood transfusion and operated on under anesthetic. The doctor told Jibril that the bullet had not damaged any organs and, after two weeks in hospital, he was released.

While he was recuperating, Jibril directed a neighbor to go back to his house to recover some money that he had hidden behind a cupboard before the militia attacked, which he used to pay for his transportation to Kenya. After he arrived in Mombasa, he found his family in the Otanga (or Utange) refugee camp. Jibril's family lived in the refugee camp until 1995, when it was closed for health and security reasons. The family then moved to Nairobi, where they joined the undocumented Somali ex-pat community and Jibril worked in a kitchen. In Nairobi, Jibril was arrested several times because he did not possess identity papers, but each time he was able to bribe the officials to obtain his release.

Over a period of several years, he accumulated $2,800 from relatives, including a relative in Saudi Arabia, who would wire the money to him in Nairobi, where another relative, who had Kenyan citizenship, would vouch for his identity. Jibril used this money to pay a smuggler, who arranged for his transportation under cover of forged documents via Paris and Mexico to the United States. Jibril entered the United States illegally in July, 1998, and filed his application for asylum on July 22, 1998.

At his hearing, Jibril conceded removability but sought asylum and withholding of removal. His asylum claim was based

on his membership in a persecuted minority clan and on his father's status as a military officer in the late, disfavored Barre regime. The IJ did not find his testimony to be credible and denied both his claims.

On April 21, 2003, the Board of Immigration Appeals (the "BIA") summarily affirmed the IJ's decision. Jibril timely petitioned to this court.

## II

**[1]** Asylum is a form of discretionary relief that may be granted by the Attorney General to an applicant who qualifies as a "refugee," defined as one who refuses to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ." 8 U.S.C. § 1101(a)(42)(A).

**[2]** To establish a well-founded fear of persecution, Jibril must show his fear to be both objectively reasonable and subjectively genuine. *See Fisher v. INS,* 79 F.3d 955, 960 (9th Cir. 1996) (en banc). The objective component of this test "requires a showing by credible, direct, and specific evidence in the record, of facts supporting a reasonable fear of persecution on the relevant ground," *id.*, which may be made by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant. *Id.*; 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").

In this case, the IJ did not find Jibril's testimony to be credible and there was no verifiable, corroborating evidence to support his story and bolster his credibility.

## A

**[3]** "[T]rivial errors by an asylum applicant do not constitute a valid ground upon which to base a finding that an asy-

lum applicant is not credible." *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996) (quotation omitted). Similarly, " '[m]inor inconsistencies' that 'reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding.' " *Id.* (quoting *Vilorio-Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir. 1988)). Why a person who provides inconsistent testimony on any *one* matter should still be presumed credible as to *all* other matters is far from obvious, but such is the rule we are bound to apply.

In this case, the IJ found an apparent inconsistency between the fact that Jibril was "pretending to be dead while these six men presumably go into his house and trample over his body and that of his brother" and the fact that "he is able to see many details with respect to these men." Those details cited by the IJ are: "the type of weapon that they have, even to the point of telling what brand of rifle it is"; "that they have a special rocket launcher weapon"; "he is able to see their clothing and the type of clothing they have"; and "he is able to even hear what they are saying."

1

**[4]** First, the IJ ignored the fact that Jibril initially saw the militia through the window, before he was shot, which could account for some of the observations. Second, the observations that Jibril did make are not the sort that would require long or detailed study; on the contrary, they are no more detailed or extensive than the sort of first impressions one would record at a glance. For example, it is unsurprising that he recognized that the militia carried Kalashnikov rifles—a sight that would be familiar to a Somali native given the ubiquity of AK-47s in Africa. The IJ mistakenly thought that "Kalashnikov" referred to a brand name rather than the most common model of machine gun in the world, which is made both under brand and piratically. Similarly, Jibril described the militia as wearing "traditional Somali dress," but when pressed for further detail could not provide it, saying that "I

was not looking at them fully, I was hiding that I was alive and that I was looking at them." The IJ cites Jibril's partial knowledge of what the militia soldiers were wearing as evidence of inconsistency, but it is the opposite: he could only describe their pants and shirts, not what they wore on their heads, which fits with the observations of a man lying on the ground. Finally, that Jibril was able to hear what the soldiers were saying is in no way inconsistent with the fact that he was lying on the floor, pretending to be dead.

2

The IJ also found that Jibril testified inconsistently about whether or not his father told him where he was taking the family when they fled. According to the IJ, "[i]nitially, he said that the father only said he would take the family to Kenya and no particular place. Then, upon further questioning, and realizing that he was being caught in an inconsistency, did [sic] indicate that he was going to take the family to Nairobi."

[5] However, the actual exchange began with Jibril's counsel asking him where the family was supposed to go and Jibril responding first "out of the country" and then "[h]e did not tell us that we were going to Mombasa the first. But later, we find our family in Mombasa in Otanga [in the refugee camp]." When the IJ then asked him "where did your father tell you that he was going with the family when he left," Jibril replied "[h]e said that we will take the family to Kenya." So far, no inconsistency. Pressing him, the IJ asked if his father had told him "any particular place in Kenya" and Jibril's answer was "No, he did not tell us any particular place. Our intention was to go up to Nairobi before, but we went to Mombasa." This is, admittedly, an unclear answer, but it does not contradict his earlier testimony and the confusion appears to be due to translation problems rather than to Jibril's unresponsiveness. Read together, Jibril's statements indicate that the family had a prior intention of fleeing to Nairobi, but ended up in Mom-

basa (also in Kenya), where Jibril eventually found them in a refugee camp. Although the transcript of Jibril's testimony is not a model of pellucidity, neither is it inconsistent.

**[6]** Because Jibril's testimony is not inconsistent or, at most, is inconsistent with regard to trivial or minor facts that do not go to the heart of his asylum claim, it cannot support an IJ's adverse credibility. *See Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660 (9th Cir. 2003).

B

**[7]** Under our case law, testimony that is "implausible *in light of the background evidence*," *Chebchoub v. INS*, 257 F.3d 1038, 1043 (9th Cir. 2001) (emphasis added), can support an adverse credibility finding. For example, a finding made by an IJ that a petitioner's testimony is implausible given the evidence in a Country Report or other objective evidence in the record is accorded deference. However, when an IJ finds a petitioner's testimony implausible based solely on "conjecture and speculation" that the testimony, though uncontroverted by any evidence that the IJ can point to in the record, is inherently unbelievable, then that "finding" should not automatically be accorded deference. *See Vera-Vellegas v. I.N.S.*, 330 F.3d 1222,1231 (9th Cir. 2003) ("The IJ's view was based on mere speculation and conjecture, and . . . conjecture is not a substitute for substantial evidence.") (quotation marks omitted).

**[8]** Although "speculation and conjecture" alone cannot sustain an adverse credibility finding, an IJ must be allowed to exercise common sense in rejecting a petitioner's testimony even if the IJ cannot point to specific, contrary evidence in the record to refute it. Without such latitude, IJs would be bound to credit even the most outlandish testimony as long as it was internally consistent and not contradicted by independent evidence in the record. Unfortunately, a survey of our precedent reveals no consistent line that has been drawn between an IJ's

legitimate application of common sense, on the one hand, and an IJ's reliance on "speculation or conjecture" in determining that a fact alleged by a petitioner is implausible on the other.

1

For example, in *Malhi v. INS*, 336 F.3d 989, 993 (9th Cir. 2003), the BIA found it implausible that the petitioner, who was university-educated and spoke Punjabi, Hindi, Bengali, and English, could not read or write Punjabi, even though he claimed to have lived in the Punjab and operated a business there for eight years. We upheld that adverse credibility determination as supported by "specific, cogent reasons." *Id*. In so doing, we did not point to any evidence in the record suggesting that university-educated Punjabis can typically read and write the Punjabi language; we simply relied upon the common-sense proposition that someone with the petitioner's purported background would be literate.

Similarly, in *Singh-Kaur v. INS*, 183 F.3d 1147, 1152 (9th Cir. 1999), we upheld an IJ's finding that it was implausible "that the [Punjabi] police would suspect Petitioner of assisting terrorists, when he had absolutely no political affiliations himself and his wife did not have a Sikh name." There again, the IJ's conclusion relied upon common sense, not upon evidence in the record regarding the manner in which the Punjabi police operate.

However, in *Ge v. Ashcroft*, 367 F.3d 1121 (9th Cir. 2004), we rejected the IJ's adverse credibility finding even though it was based on several "incredible" and "implausible" aspects of the petitioner's testimony, none of which was any more speculative than those findings upheld in *Malhi* and *Singh-Kaur*. In *Ge*, the

> IJ did not believe [petitioner's] testimony regarding the loss of his job at the government-owned shipping company after his wife's second unauthorized preg-

nancy, reasoning that "if the government was so con-
cerned about the respondent's violation of the one-
child policy, they [sic] surely would have taken
[employment] action against respondent at the time
[of the first unauthorized pregnancy]."

*Id*. at 1125. Nor did the IJ believe petitioner's testimony that
"[he] was permitted to open a restaurant after he was termi-
nated from his employment with a government-owned factory
for violating the one child policy," *id*., or that "the
government-owned factory where his wife had been
employed provided her with a modest monthly stipend when
she was forced to step down from her position after a second
unauthorized pregnancy." *Id*. For each of these findings, the
IJ provided a well-reasoned, common-sense explanation for
her skepticism. Nevertheless, we spurned her reasoning
because "the IJ's findings rest on her speculation about what
she imagined the Chinese authorities would or would not do
under certain circumstances." *Id.*

In *Singh v. INS*, 292 F.3d 1017 (9th Cir. 2002), the peti-
tioner claimed he had been arrested because of his association
with his brother. The BIA deemed his testimony incredible, in
part because he had not testified that he was questioned about
his brother's whereabouts after being arrested. The BIA rea-
soned that, if the police had really arrested him because of his
brother, they would have questioned him about it. We rejected
that conclusion because "the IJ's assumptions about what the
motives of the police should have been . . . are the sort of con-
jecture and speculation that cannot be used to support an
adverse credibility determination." *Id*. at 1024 (citations omit-
ted).

2

If there is a logical way to reconcile the first two decisions
with the latter two, it is not obvious to us. In the absence of
a clear standard, our "rule" against upholding adverse credi-

bility determinations based on "speculation and conjecture" is of dubious utility. This problem could be avoided if, instead of picking at the minutiae underpinning an adverse credibility finding, we applied the properly deferential standard of review set out in the statute. *See* 8 U.S.C. § 1252(b)(4)(B) (findings of fact are "conclusive unless *any reasonable adjudicator would be compelled to conclude the contrary*."). However, under our current practice, we must evaluate the IJ's implausibility findings to determine whether or not they are speculative or conjectural.

3

**[9]** The IJ found it implausible that Jibril could have remained unresponsive while being kicked in the head, that Jibril could have survived a gunshot wound to the stomach overnight, and that there was a medical facility in Mogadishu during the civil war that could have performed the operation that Jibril described undergoing. In each case, the IJ determined that Jibril's account was implausible without pointing to any evidence in the record that contradicted him. There was no medical testimony at the hearing to support the IJ's disbelief of Jibril's stoicism and stamina and no basis for the conclusion that western aid workers were not active in the city, as Jibril claimed. The IJ's conclusions, therefore, can only be characterized as speculative or conjectural, and cannot be the basis of an adverse credibility finding.

C

Finally, the IJ noted that Jibril's "demeanor in testifying showed much evasiveness" and that "[h]e had a constant tendency to be overly defensive in his answers and to not address the question specifically but to provide explanatory answers to simple yes or no questions." The IJ explained that "[h]ad it been something that one could see in some isolated instances, the Court would not place so much importance on

it, but the Court is troubled by the general demeanor of the respondent's testimony."

**[10]** "We give 'special deference' to a credibility determination that is based on demeanor." *Singh-Kaur*, 183 F.3d at 1151 (citing *Paredes-Urrestarazu v. INS*, 36 F.3d 801, 818-19 (9th Cir. 1994)). This is only proper, given that the IJ has an opportunity to make a first-person evaluation of all of the subtly conveyed factors that, together, can be evidence of a petitioner's credibility. Few, if any, of these ephemeral indicia of credibility can be conveyed by a paper record of the proceedings and it would be extraordinary for a reviewing court to substitute its second-hand impression of the petitioner's demeanor, candor, or responsiveness for that of the IJ. *See Paredes-Urrestarazu*, 36 F.3d at 818 ("Weight is given the administrative law judge's determinations of credibility for the obvious reason that he or she sees the witness and hears them [sic] testify, while the Board and the reviewing court look only to cold records.") (citation and quotation marks omitted).

**[11]** Remarkably, while a general finding based on "demeanor" is accorded deference, under our case law, an IJ's determination that a petitioner's testimony is "evasive" or "unresponsive" may be insufficient to support an adverse credibility finding. While these judgments will usually encompass extensive non-verbal behavior or patterns of speech, we have held that they are, nevertheless, subject to review by comparison with the inert transcript. When "the IJ's credibility determination rest[s] on factors concerning the nature of petitioner's testimony," or "aspects of [his] demeanor and method of answering questions" we have held that this evidence is "ascertainable from the record." *Arulampalam v. Ashcroft*, 353 F.3d 679, 685-86 (9th Cir. 2003). Where the record does not obviously show that the petitioner was evasive or unresponsive, our precedent instructs us not to accord deference to the IJ's demeanor finding, no matter how likely it was to have been supported by non-verbal, and therefore

non-textual, factors. The lesson for IJs is that, to the extent their demeanor findings rely on non-verbal factors, that behavior should be explicitly described in their opinion. *See Paredes-Urrestarazu*, 36 F.3d at 818 (describing "the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication.") (citation omitted). Because such evidence is not normally apparent from the transcript, it is effectively unreviewable and must be accepted as supporting an adverse credibility finding.

**[12]** In this case, although the transcript shows that the IJ admonished Jibril several times for giving explanatory answers when she requested merely a "yes" or "no" response, Jibril's answers do not appear to be unduly evasive and, when they are more than a "yes" or a "no," they usually provide useful information. They cannot, therefore, be fairly characterized as evasive or unresponsive on the basis of the transcript. Any other behavior that may have contributed to the IJ's adverse credibility finding was not described in her opinion and cannot, therefore, be given deference.

## III

The Supreme Court has repeatedly instructed us on the proper standard to apply when reviewing an immigration judge's adverse credibility determination. Time and again, however, we have promulgated rules that tend to obscure that clear standard and to flummox immigration judges, who must contort what should be a simple factual finding to satisfy our often irreconcilable precedents. The result of this sly insubordination is that a panel that takes Congress at its word and accepts that findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude the contrary," 8 U.S.C. § 1252(b)(4)(B), or follows the Supreme Court's admonition that "[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion,

but *compels* it," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992), runs a serious risk of flouting one of our eclectic, and sometimes contradictory, opinions.[1]

**[13]** Because of this state of affairs, we have evaluated Jibril's asylum claim as best we can under an idiosyncratic analytical framework that does not permit us to credit the IJ's

---

[1]Thankfully, relief is on its way in the form of the Real ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005) (the "Act"). Section 101(a)(3) (B)(iii) of the Act clarifies the grounds on which an IJ can base an adverse credibility determination, explaining that:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii).

The implications of this provision to the facts of this petition are clear: were it in effect today, we would be obliged to deny Jibril's petition. His demeanor and *any* inaccuracies in his statements, *without regard to whether they go to the heart of his claim*, would all be valid bases for the IJ's adverse credibility determination. The terms of this section of the Act are a welcome corrective, which, coupled with Congress's clear direction to IJs that there is to be no presumption of credibility, will mean that in the future only the most extraordinary circumstances will justify overturning an adverse credibility determination. Such high deference is what the law requires today, though in this case, and in the thousands of other petitions filed before the effective date of the Act, our precedent frustrates its expression.

adverse credibility determination in this case. We therefore remand this appeal to the BIA to exercise discretion regarding whether to grant asylum. *Ge*, 367 F.3d at 1127 (9th Cir. 2004).

IV

**[14]** Because the IJ held that Jibril was ineligible for asylum, she assumed that neither could he meet the higher standard necessary to prove that he is entitled to withholding of removal. *See Al-Harbi v. INS*, 242 F.3d 882, 888-89 (9th Cir. 2001). Rather than apply the withholding standard to the evidence ourselves, we remand the issue of withholding so that the agency may apply the law to the facts in the first instance, *see Jahed v. INS*, 356 F.3d 991, 1001 (9th Cir. 2004), accepting Jibril's testimony as credible and paying particular attention to the supporting evidence in the Country Reports concerning the status of the Yibir in Somalia and retaliation against those suspected of collaborating with the Barre regime.

Petition **GRANTED** and **REMANDED**.