**Yanko Hristov DIMITROV, Petitioner,**

v.

**Eric H. HOLDER Jr., Attorney General, Respondent.**

Yanko Hristov Dimitrov, Petitioner,

v.

Eric H. Holder Jr., Attorney General, Respondent.

Nos. 06–71390, 07–70276.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2009.

Filed Sept. 18, 2009.

Nicolette Glazer, Law Offices of Larry R. Glazer, Century City, CA, for Petitioner.

Robbin Kinmonth Blaya, Esquire, Oil, Barry J. Pettinato, John D. Williams, Esquire, Yanal H. Yousef, Trial, U.S. Department of Justice, Washington, DC, Ronald E. Lefevre, Office of the District Counsel

Department of Homeland Security, San Francisco, CA, WWS–District Counsel, Esquire, Immigration and Naturalization Service Office of the District Counsel, Seattle, WA, for Respondent.

Before: PREGERSON, NOONAN and BEA, Circuit Judges.

MEMORANDUM *

Yanko Hristov Dimitrov, a citizen of Bulgaria, appeals the denial by the Board of Immigration Appeals (the BIA) of his petition for asylum. We remand.

 The parties are familiar with the facts. We proceed to issues of law. First, the BIA erred in its credibility determination by treating as central to Dimitrov's claims the evidence of his ethnicity as a Gypsy. What is central is the persecutor's belief as to the status of the persecutor's victim. In deciding whether anyone has a well-founded fear of persecution or is in danger of losing life or liberty because of [protected ground], one must continue to look at the person from the perspective of the persecutor. *Lazo–Majano v. INS,* 813 F.2d 1432, 1435 (9th Cir.1987), *overruled as to a subordinate point of evidence by Fisher v. INS,* 79 F.3d 955, 963 (9th Cir. 1996). Nothing impugned Dimitrov's story that he was beaten by police who characterized him as a Gypsy. He pursued a scavenger's trade characteristic of a class at the bottom of society, analogous to that of untouchables. He did what Gypsies did and when he stepped beyond their bounds, he was threatened, jailed and beaten as a Gypsy.

The dissent would affirm the BIA's finding that Dimitrov's story is "implausible" because Dimitrov does not speak the Roma language. The evidence that many Roma children enter school lacking proficiency in Bulgarian, found in the in the U.S. Department of State, Country Report, is not sufficient to support a finding that Dimitrov was lying. Evidence that some Bulgarian Gypsies speak Roma does not contract Dimitrov's testimony that some do not. The Country Report also states that "Romani children and ethnic Bulgarian children generally attended separate schools." Dimitrov testified that his parents avoided speaking the Roma language with him at home and sent him to a Bulgarian school, rather than a school with other Roma children.

We may take judicial notice of public undisputed facts. *Singh v. Ashcroft,* 393 F.3d 903, 905 (9th Cir.2004) (taking notice of an article in the *Encyclopedia Britannica*). As the *Britannica Book of the Year* (2006) reports in an article entitled "The Roma—Europe's Largest Minority," the Communist regimes in Eastern Europe "suppressed the use of the Romani language." At the beginning of the present century, one Gypsy in five did not speak Roma in Bulgaria. *See* Peter Bakker, "Romani in Europe," *The Other Languages of Europe* (ed. Clevedon, 2001).

 The BIA also erred in doubting his account of his condition after the beating. The differences between the medical certificate reporting his condition and his testimony did not consist in contradictions but in emphasis, phrasing or degree of severity. The certificate said he had "crippling of movement from the waist down." That diagnosis is not inconsistent with his testi-

---

* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

mony that, with a sense of necessity, he walked with difficulty, taking "a long time," two kilometers to reach refuge in his parents' home. The certificate spoke of "visible fractures in the face ... with fractural damage in the nasal area." Dimitrov testified that the police "hit my nose" but that "he did not tell me anything about a broken nose." The difference between a broken and a battered nose does not go to the heart of his claim, especially when it is his testimony that diminishes the injury.

The BIA's characterization of Dimitrov's testimony as "vague" is an inappropriate description of his detailed narrative. The BIA's treatment of the term "robbed" used by Dimitrov in his airport interview is woodenly univocal. "Robbed" in common parlance covers every outrage from being scammed to having one's favorite sports team the victim of bad umpiring. A remand is in order.

The CAT claim fell with the asylum claim and so, too, requires remand.

There was no violation of Dimitrov's right to due process. The translation was his own lawyer's responsibility.

The motion to reopen was late. That decision is mooted by our conclusion here.

REMANDED.

BEA, Circuit Judge, dissenting:

I respectfully dissent. Yanko Hritsov Dimitrov petitions for review of the Board of Immigration Appeals' ("BIA") decision denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture. Dimitrov claimed before the BIA that he was a Bulgarian Gypsy, even though he spoke no Romani, did not have a Gypsy name, and appeared to know little about Gypsy culture. The BIA found Dimitrov's testimony he was a Gypsy was "implausible," and, on the basis of this adverse credibility finding, denied his applications for relief.

Contrary to the majority's assertion, the BIA's adverse credibility finding went to the heart of Dimitrov's claims. *See Desta v. Ashcroft*, 365 F.3d 741, 745 (9th Cir. 2004) (holding that when an immigration judge ("IJ") denies asylum based "on an adverse credibility determination, he must provide specific, cogent reasons to support his determination ... [which] cannot be peripheral, but rather must go to the heart of petitioner's claim"). Even if Dimitrov could prevail by claiming his persecutors perceived him to be a Gypsy, that was not his claim before the BIA. Dimitrov claimed he was entitled to asylum because he was, in fact, a Gypsy. If the BIA disbelieved him about his claim he was a Gypsy, and this disbelief is supported by substantial evidence, the BIA was also entitled to disbelieve the remainder of Dimitrov's testimony, including his testimony he was persecuted by Bulgarian police because they perceived him to be a Gypsy. *See Wang v. INS*, 352 F.3d 1250, 1259 (9th Cir.2003) ("[W]hether we have rejected some of an [BIA]'s grounds for an adverse credibility finding is irrelevant. So long as one of the identified grounds is supported by substantial evidence and goes to the heart of [the petitioner's] claim of persecution, we are bound to accept the [BIA]'s adverse credibility finding."). Even were we to credit evidence in the record showing Dimitrov was assaulted by police in Bulgaria, without Dimitrov's testimony, there is no basis to conclude Dimitrov was assaulted "on account of" the Bulgarian police's perception Dimitrov was Gypsy. With respect, the majority errs in saying "Nothing impugned Dimitrov's story he was beaten by police who characterized him as a Gypsy." *Supra* at 2. Dimitrov's false story he was a Gypsy impugned it. One can believe Dimitrov's story only if one believes Dimitrov; if Dimitrov is a liar

about being a Gypsy, the BIA can disbelieve the rest of his testimony. It is that simple.

The BIA's conclusion that Dimitrov's testimony he was a Gypsy was implausible is supported by substantial evidence and is not mere "speculation" or "conjecture." *See Jibril v. Gonzales,* 423 F.3d 1129, 1135 (9th Cir.2005) ("Under our case law, testimony that is implausible in light of background evidence can support an adverse credibility finding.... However, when an IJ finds a petitioner's testimony implausible based solely on 'conjecture and speculation' that testimony ... should not automatically be accorded deference.") (internal quotation marks omitted). Dimitrov averred he grew up in a Gypsy neighborhood, played only with other Gypsy children because he was afraid to leave the Gypsy community, and that he served in a special Gypsy-only unit of the Bulgarian military. Yet he testified at the hearing that he spoke no Romani. The critical question, then, is whether it was reasonable for the BIA to conclude, on the basis of the record before it, that a true Gypsy, raised in a Gypsy community, would speak Romani. With respect, the majority errs when it states: "Like many European Gypsies, [Dimitrov] did not speak Roma." *Supra* at 3. The majority does not favor us with the source of its insight about what many European Gypsies do or do not speak. But, it was not mere speculation for the IJ to conclude that a Gypsy who grew up in a Gypsy neighborhood in Bulgaria would speak Romani. The record before the BIA included a State Department country report on Bulgaria. U.S. Department of State, Country Reports on Human Rights Practices—2003, Bulgaria (February 25, 2004). [ER 233] This report stated both that Gypsy children entering Bulgarian schools were not proficient in Bulgarian and that, in an effort to integrate Gypsies into the Bulgarian police forces, the Bulgarian police introduced bilingual training manuals. *Id.* at 10, 12. Both of these facts suggest that a Bulgarian Gypsy would most probably speak Romani. And from this, the BIA could conclude that it was implausible that a true Gypsy, who grew up in a Gypsy neighborhood, as Dimitrov did, would not speak Romani.

Dimitrov's evidence to the contrary does not support his contention that a Gypsy in Bulgaria would not be likely to speak Romani. At most, it shows that many Gypsies are now bilingual. In any event, this evidence was introduced for the first time in an untimely motion to reopen. Because the untimely filing of this motion is not excusable, we lack jurisdiction to consider it. *See Ekimian v. INS,* 303 F.3d 1153 (9th Cir.2002).